The only question presented is, as to the relation sustained by the plaintiffs, or rather Dodge, one of the plaintiffs, to the defendants, in the business, of which the making of the drafts stated in the pleadings, constituted a part. This fact has assumed an importance since the failure of Gower, Nephews Co., which no one, before that event ever thought of attaching to it. It may be true, as the defendants insist, that they supposed that Dodge was ultimately responsible to them, for the payment of the money advanced on the drafts in question. But as the London house was primarily liable, and its credit undoubted, and as advances had been authorized by them, upon the actual consignment of property, supposed to furnish a full indemnity, a failure to meet its engagements, was not probably among the contingencies entering into the calculation of either of the parties. That house, however, did fail on the 11th of September, 1847, leaving a part of the bills drawn *Page 587 
by the defendants, by way of reimbursing themselves, for advances made upon the lot of eight hundred bales of cotton, unpaid; and the question arises, in what capacity were advances upon this parcel made by the defendants; which involves the others above suggested, in what relation did Dodge stand to the defendants, when the original drafts made by him, were accepted and paid by the former. Was he the principal and was the acceptance of the defendants for his accommodation, or were both drawer and accepter, the agents of a common principal, the firm of Gower, Nephews Co., in London. The latter hypothesis is the only one consistent with the facts proved or admitted. That Dodge was the agent of the Gowers with authority to bind his principals, for an advance within prescribed limits for all cotton purchased at the south, or which he could influence to be consigned to them, according to the stipulations in the agreement of the 14th of August, 1846, while the defendants were also the agents of the same principals, acting under their instructions, in accepting all drafts drawn by Dodge upon them, on account of such advances, with the right to reimburse themselves by drafts on the consignees, which the latter were bound by their agreement to accept, and pay at maturity.
This is obvious from the correspondence. Thus the letter from Gower, Nephews Co., to Dodge, of the date above mentioned, and upon which the defendants' counsel placed great reliance, declares, "that these advances are in the usual manner to be made either by draft directly, on us, at from sixty to ninety days' sight, or by your drawing on New-York at as long a usance as is practicable, the acceptors and payers there of these drafts reimbursing themselves at maturity, by valuing on us in time for the sterling equivalent, at the customary sight, and specifying in these drafts the payments against which they are issued." They then add, "that your own friends in New-York, Messrs. Markoe, Wilbur Scott, will be advised of this arrangement and requested to co-operate *Page 588 
in carrying it into execution." Accordingly, on the eighteenth of the same month, they enclose a copy of the arrangement with Mr.Dodge to those gentlemen, and in their letter remark, "we have, in forwarding it to you, to confirm its contents as far as they apply to you, and beg that you will give your bestassistance in carrying the plans traced out, into execution." On the 11th December, 1846, the defendants wrote Dodge, as follows: "We refer to the various letters you have received from our friends, Messrs. Gower, Nephews Co., in relation to advances on consignments to their address, the present season. We confirm
their views and instructions as far as we have to do with them, and authorize your drafts upon us as usual to the extent of theauthority granted you by them."
If the evidence stopped here, which is by no means the case, I do not perceive that there could be any doubt as to the character in which the New-York house accepted and paid the drafts in question. They were drawn in pursuance of the authority conferred on Dodge by the agreement of the fourteenth of August, according to which Gower, Nephews Co. were to make all the advances on cotton consigned to them, by means of bills drawn upon them directly, or circuitously on the defendants in the city of New-York. A copy of this agreement was placed in the hands of the defendants, with a request that they would co-operate in its execution. To this they assented, not only by acting under it, as the evidence will prove, but by expressly ratifying it in a communication to the drawer.
They accepted these drafts, because they were authorized by the London house, and because they were requested by them to make advances in this way, not for the accommodation of Dodge, but to enable the consignees to comply with their engagement. The consideration of their acceptance and payment was the agreement of Gower, Nephews Co. to reimburse them, and a commission of one per cent, for supervising the business, so far as to keep the agents within *Page 589 
the authorized limits, and for advising their principals, from time to time, of the extent, and particular character of the responsibility incurred by them, in their behalf. When the securities were paid by the defendants, therefore, they discharged, pro tanto, an obligation of their principals to another agent, to advance upon consignments of property to them. The consignees became liable immediately to the defendants for the money thus advanced and their commission, and failing to accept and pay the bills drawn by way of reimbursement, they could have been sued as for money paid, and services rendered on their account and at their special request. Of this assumpsit the agreement and letters to which reference has been made, would furnish undoubted evidence.
No action could be maintained against Dodge upon the bills, as the defendants were the acceptors. Nor for money paid, because the defendants, knowing the precise relation in which he stood to the Gowers, that he drew by their instruction, with a view to raise money for their benefit, had recognized his agency and authorized his drafts upon them, "to the extent" of the authority granted. It is true that consigned property was made to pay ultimately all expenses, commissions of the defendants inclusive.
But the consignees were primarily liable for them and would be obliged to pay them, whether they succeeded in reimbursing themselves from the property or not. The defendants had no interest in or lien upon the cotton during its transit, or on its arrival at its place of destination. The bills of lading were made to the consignees, who were to insure it and make disposition of it on account of the shippers. The communications and instructions of Dodge to the defendants, and through them to the house in London, are all reconcilable with the view above suggested. He was not only the agent of the Gowers in procuring consignments, but he sometimes acted as the agent of the shippers and was occasionally interested as owner of the property. In the latter capacity he was interested in the rate of exchange, *Page 590 
the time which the bills drawn against it had to run, commission, expenses and indeed every circumstance that might affect the price in the foreign market, and prevent or lessen the probability that it might afford a remuneration to the consignors. The correspondence of Mr. Dodge, to which reference has been principally made by the counsel of the defendants upon the argument, is upon these topics, and as his relations to their common principal, to the shippers and to themselves, were perfectly understood by the defendants, there can be no pretence that they were misled to their prejudice.
They assume no such ground. But insist that they were entitled to the ultimate responsibility of Dodge, in addition to that of the English house, as to all moneys advanced on his drafts. I think there is nothing in the form in which the business was uniformly transacted, or in the substantial relations of the parties to each other, legally to justify this claim and that it was properly disallowed by the superior court.
There is no force in the suggestion that a co-partnership was created between Gower, Nephews Co., and Dodge by the contract of the fourteenth of August.
The latter was not to receive any part of the profits of the business of the English house arising from this or any other part of it. He was to receive one-third of the commissions as a compensation for his services. That this will not constitute a copartnership contrary to the expectations of the parties has been too frequently held to be now an open question. (Burckle
v. Eckhart, 3 Comst., 132.)
The judgment of the superior court should be affirmed.
All the judges concurring,
Judgment affirmed. *Page 591 
[Copies of the two following opinions, omitted in the reports of the cases in which they were delivered, having been frequently called for, it is thought advisable to place them where they will be more readily accessible to judges or counsel, who may have occasion to refer to them. The first opinion was mislaid, and for that reason was not given in the original report. See 2 Seld., 510; and 5 id., 463.]
 NICHOLSON against LEAVITT.
EDMONDS, J. The question is presented in this case, simply and nakedly; whether a voluntary assignment by a debtor in failing circumstances is void by reason of its containing a clause authorizing the assignee to sell the assigned property on credit.
I should be inclined to consider the decision of the supreme court in Burdick v. Hunting (MS.), and the ruling of this court in Barncy v. Griffen (2 Comst., 371), as decisive of the question. I have no means of going behind the report of these cases, to inquire into the private opinion of the members of the court, and if I had, I should be reluctant to do so, lest I might be regarded as sanctioning a course that may tend to unsettle and weaken the authority of the court of last resort. So far as the record of the case, made by the authorized officers of the state, may, in its language give rise to doubts or criticism, it becomes a perfectly legitimate subject of inquiry. But when that record is sufficiently explicit on its face, I cannot feel myself at liberty to impair its just force, by any private cross-examination of the members of the court, or by any private and irresponsible statement of theirs in conflict with the plain import of their official language.
As, however, the authority of the decision of this court has been questioned by the inferior tribunal, whose judgment *Page 592 
we are now considering, and has been fully discussed on the argument before us, it will be as well to reiterate here, and on this occasion, and if practicable, in language too explicit for doubt, our entire concurrence with the ruling on this point, in both of the cases referred to.
For more than thirty years our courts have been struggling to keep within due bounds, voluntary assignments by failing debtors. No one can be engaged long in the administration of justice, without becoming sensible how much fraud and mischief are perpetrated under color of such machinery. To punish a vigilant creditor, to extort terms from him, to keep the property within the debtor's control by means of a friendly assignee; or to make it as available to him as possible, are far more frequently the purposes of such assignments than a fair and equal distribution of the property among those to whom it equitably belongs. And the result at which courts are bound to aim, such distribution, namely, and that as soon as practicable, is almost invariably thwarted by these assignments and the delay and hindrance which they interpose, under the pretence of equality and a full dedication of the debtor's effects to the payment of his debts. Under the name of that equality which is equity, the means of the debtor are placed beyond the reach of his creditors, and frequently consumed in expenses and charges by the assignee rather than in the liquidation of debts. Such is most generally the practical effect of tolerating these voluntary assignments, and no one can long occupy a seat on the bench without witnessing and lamenting it.
The only ground on which they have ever been allowed at all, is, that they do only that which every principle of honesty demands, and surrender all of the debtor's property to the satisfaction of all his debts. Yet it most frequently is true, that they operate to withdraw that property from that legitimate purpose, at least for a while, if not permanently, and often appropriate it to other purposes. *Page 593 
The courts have been compelled to witness these frauds, thus perpetrated in the name of the law, until they have been constrained by a sense of duty, to aim at suppressing the evil as far as in them lies, and at attaining that equality which is shunned under the pretence of seeking it.
From the cases of Murray v. Riggs (2 J. Ch. R., 565), andHyslop v. Clark (14 J.R., 458), both in 1817, until this day, our courts, both of law and equity, have struggled for the attainment of this object and have been engaged in striking down the various forms, devised by the ingenuity of debtors, to pervert a rule, sounding fairly, to purposes of evil.
I remember, well, the effort that was made in the court for the correction of errors, in the case of Grover v. Wakeman (11Wend.), to relax the strict rule of the courts and sustain these voluntary assignments as a quasi necessary substitute for a bankrupt law. I was myself engaged in that effort, and was unwilling to extend the rule any further than it had been extended in the case of Murray v. Riggs. But after full and mature consideration, I was overruled by a very decided majority of the court, and the ruling of Grover v. Wakeman, has ever since, for now some twenty years, been the unwavering law of this state.
The principle established by that case, was happily and forcibly stated by Judge SUTHERLAND, who delivered the prevailing opinion of the court in Grover v. Wakeman, and it is manifest from the report of the latter case, that it was the intention of that, the court of last resort, after full consideration, so to establish it. "It is time," he says, "that some plain, simple but comprehensive principle should be adopted and settled upon this subject. In the absence of a bankrupt law the right of giving preferences must probably be sustained. Let the embarrassed debtor, therefore, assign his property for the benefit of whom he pleases; but let the assignment be absolute and unconditional; let it contain no reservations or conditions for the benefit of the assignor; *Page 594 
let it not extort from the fears and apprehensions of the creditors, or any of them, an absolute discharge of their debts as the consideration for a partial dividend; let it not convert the debtor into a dispenser of alms to his own creditor, and above all, let it not put up his favor and bounty at auction
under the cover of a trust to be bestowed upon the highest bidder. After the maturest reflection upon this subject, I have come to the conclusion that the interests, both of debtor and creditor, as well as the general purposes of justice, would be promoted, if the question is still an open one, by confining these assignments to the simple and direct appropriation of the property of the debtor to the payment of his debts. The remnants of many of these insolvent estates are now wasted in litigation, growing out of the complex or suspicious character of the provisions of these assignments. One device after another to cover up the property for the benefit of the assignor, or to secure to him, either directly or indirectly, some unconscientious advantage, has from time to time been brought before our courts and received condemnation. But new shifts and devices are still resorted to, and will continue to be so, until some principle is adopted upon the subject, so plain and simple that honest debtors cannot mistake it, and fraudulent ones will be deterred from its violation by the certainty of detection and defeat. The principle to which I have adverted, it appears to me, if adopted, will, to a very considerable extent, accomplish that object."
I acknowledge the binding force of this decision even in this, the court of last resort, and have ever felt myself constrained to obey it, when sitting in any inferior tribunal. And it is, perhaps, proper that I should admit that subsequent reflection and experience have tended to impress on my mind the conviction of its entire propriety. I am, therefore, disposed to reaffirm it, in the broad and explicit language in which it was then announced. I have already had occasion to do so at the special term of the supreme court, *Page 595 
upon the same question now presented to us, and I am now persuaded that there is no other rule that can be safely adopted, to prevent the innumerable frauds that are perpetrated under the sanction and in the name of these voluntary assignments.
The great consideration that is urged in support of the clause which is objected to in this assignment is, that the assignee must have some discretion as to the mode of selling the property, and that discretion may often warrant a sale on credit; that sales on credit are often expressly sanctioned by the statute, and that, therefore, it cannot be improper to confer in terms upon the assignee the power which flows to him as a necessary incident of his position, or in the language used in this regard, "if the law says that the authority, as necessary and beneficial, is given by implication, we shall not commit the absurdity of saying that it is illegal and fraudulent when given in terms."
Now, it seems to me, that this argument overlooks this important consideration, that sanctioning this clause, "when given in terms," strips the creditor of his control over the property and confers that control on the debtor.
When a debtor becomes insolvent, his property belongs in equity and justice to his creditors and not to him, and thenceforth, the object and aim of the law is, to give it to his creditors. He has an interest to see that it is not sacrificed or wasted, but is so managed as to pay as much of his debts as possible. This is the extent of his equitable interest, but it is subordinate to the rights of his creditors, which are to have the property applied to the satisfaction of the debts without fraud, hindrance or delay.
That subordination is an inflexible principle of the law, and is universal, save only where it is interfered with by the rule, which sustains these voluntary assignments. It is in obedience to that principle that the creditor has a right to resort to the courts, and to enforce the satisfaction of his claim even at the expense of a forced sale and sacrifice of the debtor's *Page 596 
property. It is that which lies at the foundation of all bankrupt laws, and is interwoven into our insolvent laws. It is founded in justice, enacted into our statutes, and is necessary for the due protection of the immense mass of mercantile transactions which are accumulating around us. Yet it is invaded by the rule which sanctions voluntary assignments, a rule having its origin not in the statute, but in the decisions of our courts, and springing from the difficulties flowing from the absence of a general bankrupt law. A bankrupt law, that would take from the debtor the control of his property when he became insolvent, and transfer it to his creditors, and to them all, and not to such one only as would press the hardest, would obviate all the difficulty. But in the absence of such a law, there is nothing to stay the progress of the vigilant creditor, but a voluntary assignment. How far that assignment shall go, and what shall be its provisions, and what its office, beyond the invasion of the subordination already spoken of, has been the dispute. It is already too well settled for us now to shake, that it may also perform the office of preferring one creditor to another. Shall it go further? Shall it also give the debtor power to say to his creditor, you shall wait my pleasure for your pay? You shall abide my time and not select your own for the satisfaction of your just claim? Because, if it may, it necessarily takes from the creditor the control of the mode and manner in which he shall coerce payment, and confers it upon the debtor and the friendly assignee whom he may choose. And can any one say that this is not hindering and delaying creditors? Practically it is so, reason or refine upon it as we may. Anything that interrupts the creditor in the lawful pursuit of his remedy through the courts, for the purpose of enforcing payment, hinders and delays him.
It may be said, however, that this strikes at the principle of voluntary assignments at all, and especially at that which allows of preferences among creditors. Truly, it does seem so; yet those two principles, whether they are exceptions or *Page 597 
qualifications to the general rule, are far too well settled for me now to intend to disturb them. The general rule is referred to, for the purpose of avowing the determination at once, of adhering to it and allowing no further exceptions or qualifications to it.
It is not difficult to see how the creditor may be delayed and hindered by the clause in question. When he has obtained his judgment, he has a right to his execution at once and to a sale of the debtor's property, within such time as the law allows. But the assignment takes away from him that right and compels him to wait such time as the assignee may see fit, subject only to such control as the court may exercise over an unreasonable delay. If it be lawful to insert such a clause, then it will be lawful for the assignee to give a credit, and the only control the creditor can exercise through the courts will be over an unreasonable delay, while without the clause he may ask the courts to order a sale without any delay. In one case, the delay will be in the exercise of a sound discretion, with which the courts will not, for a slight cause, interfere. In the other, it will be an arbitrary act and readily controlled. In one case to give credit, and thereby cause delay, will be a part of his duty, written down for him, and in the other, it will not be allowed without permission obtained. In one case, it will be at his option, and in the other only by direction of the court after notice to the parties in interest. In one case, he may consult the interest of the debtor who has selected him, and in the other, he must consult that of the creditor, whose trustee he is.
It will not be difficult then to see how the rights and remedies of the creditor may be in fact affected by legalizing this obnoxious clause; and practically we know, and have often seen, how it may be, and has been, used as a means to that end.
The suggestion that credit on official sales is sometimes authorized by statute does not strike me as having any application *Page 598 
to the case in hand, for it seems to me there is some difference whether an act is authorized by statute or not. And if the fact that a principle is adopted in a particular statute is a ground for its universal application, and that seems to be the argument, then the provision of the insolvent laws, forbidding preferences, would destroy all assignments of that character.
But it is unnecessary to dwell upon the other suggestions that were made on the argument. I have already stated the general principle on which I regard this clause as illegal, and that is in no wise affected by those suggestions, for I look upon the clause as evidence of an intention to hinder and delay creditors, because such is the inevitable result of it, and we must infer "that a man intends to do what his deliberate conduct plainly, distinctly and inevitably tends to accomplish." It may very well be, that where the hindrance and delay is the necessary consequence of an act otherwise lawful of itself, that will not vitiate the deed, but where the intent and object is to hinder and delay, though final payment is fully intended, such intent will render void the deed. The case of Van Nest v. Yoe (1Sand. Ch. R., 4) is a striking illustration of the principle. (See also Ward v. Trotter, 3 Monroe R., 1; Vernon v.Morton, 8 Dana R., 247.)
In all of those cases the ultimate dedication of all the debtor's property to the payment of his debts was provided for, but in the meantime the assignment was intended to prevent a sacrifice of it, by forced legal sales, and because of that intent the instruments were held void. And rightly so, I think, and it was well said in one of those cases: "It is no answer to say that the debtor provides an ample fund for the payment of the debt and that the creditor is ultimately to be paid in full. The law gives to the creditor the right to determine whether his debtor shall have further indulgence or whether he will pursue his remedy for the collection of his debt." It is this right which the clause in question would interfere with, and that interference is no *Page 599 
more lawful in one case than the other. It has always been considered objectionable for the legislature to pass laws to stop or delay parties in the collection of their debts. To allow a party to make a stop law of his own is still more obnoxious to sound principle.
I am, therefore, of opinion, that the assignment is void by reason of the clause which authorizes the assignee to sell the assigned property on a credit, and the judgment of the superior court ought to be reversed.
 PRATT against FOOTE.[1]
JOHNSON, J. This action was commenced under the Code and was tried in June, 1850, by consent, without a jury, before Mr. Justice WRIGHT. The decision was not pronounced at the conclusion of the trial, but was delivered in writing at a subsequent period. It does not specify separately the conclusions of law and fact, at which the judge had arrived, but simply declares that "the court do decide that the plaintiff do recover." An exception was afterwards taken to the decision and judgment, and was duly sealed by the learned judge. The exception is to the decision and judgment, specifying the point not otherwise than by that exception. The plaintiff contends that this exception presents no point for review. Under the Code of 1849, which was in force when the trial took place, the judge was not bound, as he was under the Code of 1848, to state his conclusions of fact and law separately (§ 267), but was at liberty to pursue the course which has been taken in this case, and by his decision to determine all the questions of fact and law. I do not see how the exception to such a decision can take any different form from that which has been employed in *Page 600 
this case. It may be made at any time within ten days after notice of the judgment (§ 268), and it therefore does not seem to come within the reason of those rules which govern exceptions taken at trials before a jury. Looking at the case in the most favorable way for the party succeeding at the trial, the judge must be taken to have determined all the questions of fact upon which there was conflicting evidence, in favor of the successful party, and the exception is to be taken to allege, as matter of law, that all such facts being so found, the decision made is contrary to law. It presents exactly the same question that would arise upon a trial before a jury, if, at the conclusion of the evidence, the excepting party had requested the judge to direct a verdict in his favor, and the request had been refused. The proposition presented, is, that as matter of law, the cause cannot be decided against the excepting party. In this case there is no conflict of evidence, and the question upon which the case turns is a mere question of law. The plaintiff held the defendant's note, payable at the plaintiff's bank, November 20th, 1846, on which Samuel Scudder and another were indorsers. About the 15th November, 1846, the defendant brought to the bank a check of Samuel Scudder, the indorser, drawn upon the bank, payable to defendant's order and indorsed by him, dated November 20th, 1846, for an amount sufficient to pay his note. The defendant proposed, then, to take up the note in exchange for Scudder's check. This was declined, but the cashier of the bank told him he would pin the check to the note, as they both fell due on the same day, and if Scudder's account was good when the note fell due it would pay the note. It was also arranged that the note, if paid, was to remain at the bank till the defendant should call for it. On the twentieth of November, Scudder's account at the bank was overdrawn some $6,000 or $7,000. Between that day and November twenty-fifth, the bank placed to the credit of Scudder in his account with the bank, $3,812.61, or thereabouts, being the *Page 601 
proceeds of certain discounts made by, and payments made to, the bank, on Scudder's account.
On the twenty-fifth of November, Foote's note was entered on the books of the bank by the proper officer, as paid, and Scudder's account was charged with the check.
Just such entries were made as would properly have been made if on that day Foote had presented to the bank Scudder's check and had received the money for it, and had then, with the money, paid his note.
Upon these facts, as to which there is no conflict of evidence, the question upon the merits in this cause arises. The supreme court, at special and general term, have considered the rights of the parties as depending upon the question whether there was an agreement between the defendant and plaintiff, that Scudder's check should be received absolutely in payment of Foote's note. If that is the turning point in the cause, the court below has, beyond all doubt, rightly disposed of it. To me it seems, however, that the true question is rather, whether Scudder's check has not, as between these parties, been actually paid, and upon that question I am of opinion with the defendant. Suppose Foote had presented Scudder's check to the bank and they had paid it, they could never in any form have recovered the money back again, there being no pretence of fraud upon, or mistake by the bank. Scudder's request to them to pay money on his account was one which, under the circumstances, they were at liberty either to reject or accede to, but having acceded to it they were not afterwards at liberty to recall their act. It seems to me that the payment of Scudder's check by charging him with it in account, was as complete a payment as if the money had been handed across the counter to Foote and by him had been handed back again in payment of his note. (Levy v. Bank U.S., 4Dal., 234; 1 Binney, 27; Bolton v. Richards, 6 T.R.,
138, 143.)
On the ninth December, Foote came to the bank, and on inquiry was told that the check had not been paid, and was *Page 602 
informed that no notice of protest or non-payment had been given upon the check. He was not informed what had been done in respect to the check.
Under these circumstances, although he may, by giving the new note, have waived any right growing out of the non-protest of the check, he cannot be deemed to have waived the effect of its payment. As to that, he stands as if the new note had never been given.
I think there should be a reversal of the judgments at general and special term, and a new trial, with costs to abide the event.
[1] This case may be found in Selden's Reports, Vol. 5, page 463.
 *Page 9